JUSTICE REGNIER
delivered the Opinion of the Court.
¶1 This appeal involves a custody dispute between Kathleen M. Cox (Cox) and Eugene Joseph Paslov (Paslov) regarding their minor son, Dylan. At the time of this appeal, two courts, the Third Judicial District Court, Powell County, Montana, and the High Court of American Samoa, had rendered conflicting custody determinations regarding Dylan. Cox appeals from the July 22, 2002, order of the Third Judicial District Court which enforced an earlier parenting plan issued on September 11,2000, over a custody order issued by the High Court of American Samoa on July 17, 2001. We affirm.
¶2 Cox presents the following issues on appeal:
¶3 1. Whether the District Court erred in failing to recognize the *96 custody order entered by the High Court of American Samoa.
¶4 2. Whether the District Court erred in modifying the original parenting plan issued by the State of Oregon by awarding sole custody of Dylan to Paslov.
¶5 Paslov presents the following issue on cross-appeal:
¶6 Whether Cox timely appealed the District Court’s September 11, 2000, custody order. Because we affirm on Appellant’s Issue 1, it is not necessary to reach either Appellant’s Issue 2 or Respondent’s issue on cross-appeal.
FACTUAL AND PROCEDURAL BACKGROUND
¶7 Paslov and Cox were married in Nevada on February 5,1991, and later moved to Oregon. At the time of their marriage, Cox had two older children from a previous marriage, Diedre and Warren Enteron. Paslov and Cox had one child together, Dylan, born November 8,1994. The parties were divorced in Oregon on March 14, 1999. The final parenting plan issued by the Oregon court granted sole custody of Dylan to Cox and provided that Paslov pay $300 per month child support. Additionally, the Oregon Court granted the parties’ agreed upon parenting plan which provided that Paslov have regular visitation on alternating weekends with Dylan at his paternal grandparent’s home in Carson City, Nevada, with Paslov to pay for air transportation for Dylan, who would be accompanied by an adult (either Cox, Deidre or Warren). Paslov was to have parenting time with Dylan on Dylan’s birthday, alternating holidays and for one month during the summer after notifying Cox of the time period by May 1 of each year.
¶8 After the divorce, Paslov moved back to Nevada and, sometime in the fall of 1999, Cox moved to Deer Lodge, Montana, in anticipation of her marriage the following summer to Don McGee, a Butte resident. Paslov asserts this move was made without notification, which Cox denies. Whatever the case, ongoing relations between the parties proved difficult, and visitation between Paslov and Dylan was sporadic. Paslov asserts Cox’s relocation was an attempt to deny his opportunity to visit Dylan. Cox counters Paslov’s failure to pay for Dylan’s airfare to Carson City was the reason for any visitation difficulty Paslov may have encountered.
¶9 Paslov then traveled to Helena, Montana, and secured an attorney to initiate modification to the parenting plan for more visitation time with Dylan. On April 3,2000, Paslov filed in the Third Judicial District Court (1) a petition to recognize and register the Oregon parenting *97 plan, and (2) a motion to amend the Oregon parenting plan. The motion requested Cox remain Dylan’s sole custodian, but that Paslov be granted expanded visitation with Dylan.
¶10 On May 18, 2000, in response to Paslov’s petition, Cox stipulated that the District Court could recognize and register the Oregon decree of dissolution and final parenting plan and assume jurisdiction over the parenting plan proceedings. However, she objected to Paslov’s request for modification of the parenting plan. The following day, the District Court also granted an ex parte motion by Paslov requiring Cox to produce Dylan for a weekend visit in Butte, Montana.
¶11 On May 22, 2000, the District Court, noting that both Cox and Dylan were residing in Deer Lodge, Montana, and that Dylan had significant contacts in the State of Montana, issued an order in which it recognized and registered the Oregon decree of dissolution and parenting plan as a valid decree. It also accepted jurisdiction in all matters involving the custody and visitation of Dylan, including Paslov’s motion for amending the parenting plan and all other subsequent actions.
¶12 While Paslov’s motion to modify the parenting plan was pending before the District Court, relations between Cox and Paslov worsened. Among other things, Paslov was angry because he was not receiving his phone calls from Dylan, and Cox was angry that Paslov was insisting upon his court-ordered parent-child contact for the summer. On June 16, 2000, Cox filed a motion to hold Paslov in contempt for failure to pay thousands of dollars in child support. Then, on June 22, 2000, four days before Paslov was to pick up Dylan for his month-long summer visitation, Paslov and Cox had a publicly heated argument at a Wal-Mart in Butte. During this argument, Cox asserts Paslov threatened to ruin her upcoming wedding, stalk her for the rest of her life, and harm both her and her children. On June 28, 2000, Paslov filed an ex parte motion to enforce the parenting plan regarding the summer parent-child visitation, which was subsequently granted.
¶13 Following this public scene and Paslov’s ex parte motion, Cox petitioned the Silver Bow Justice of the Peace for a temporary restraining order (TRO), which was granted. However, the order was almost immediately rescinded when Justice Court learned that a custodial proceeding was pending in District Court.
¶14 Cox was never served with the Ex Parte Order for Parent-Child Contact regarding the summer visit; nor was she notified of the rescinded TRO. She was not notified because she left Montana with Dylan and returned to American Samoa, her homeland, asserting *98 safety concerns for herself and her children. Cox left without notice to either Paslov or the District Court, she was not found, and Paslov did not receive any parent-child contact in the summer of 2000.
¶15 On August 1,2000, Paslov amended his pending motion to request he receive sole custody of Dylan. Paslov also requested Cox’s contact with Dylan be restricted to supervised visitation, Cox undergo a psychological evaluation, and Cox pay Paslov’s attorney fees and costs.
¶16 On September 7,2000, the District Court conducted a hearing on Paslov’s petition to change Dylan’s custody. Cox was not in attendance at the hearing, despite being served notice of the hearing both at her last known address and by publication. On September 11, 2000, the District Court granted Paslov’s petition and awarded sole custody to Paslov. Additionally, the court ordered Cox have no parent-child contact with Dylan, unless and until she submit to, and successfully complete, a full psychological evaluation. Once the evaluations were complete, the therapist would provide a written report to the District Court regarding a recommendation for visitation between Cox and Dylan so the court could determine what, if any, parent-child contact Cox should have with Dylan. In fact, the court order specifies that both parents participate in psychological evaluations in order for the court to have complete and well-rounded information. The court also terminated Paslov’s child support obligations, and awarded Paslov attorney fees and costs. Additionally, the court ordered that all law enforcement agencies were to continue their efforts in searching for Cox and Dylan, as their whereabouts were still unknown at that time.
¶17 On November 22, 2000, Cox filed an action in the American Samoan court system to modify the September 11, 2000, order of the District Court. She sought to be designated as the exclusive custodian of Dylan. On April 5, 2001, The High Court of American Samoa conducted a trial on Cox’s petition in which both Cox and Paslov personally appeared with counsel. Paslov contested the jurisdiction of the Samoan court and requested it recognize the District Court’s jurisdiction over the parenting plan.
¶18 On July 17,2001, the High Court of American Samoa entered its opinion and order, concluding it had jurisdiction over the matter and that Dylan’s interests would best be served by residing with his mother. It modified the District Court’s September 11,2000, order by granting sole custody to Cox, with reasonable supervised visitation rights to Paslov. Paslov initially appealed the Samoan decision, but subsequently withdrew his appeal.
¶19 On March 7, 2002, Paslov filed a motion in District Court to *99 enforce its September 11, 2000, custody order. On the same date, Dylan’s paternal grandparents also filed a motion in District Court to enforce grandparent contact with Dylan. Cox responded with a motion to quash on the basis that the Samoan Court had jurisdiction over this matter. On July 22, 2002, after briefs and oral arguments were submitted, the District Court issued an order granting both Paslov’s motion to enforce its September 11, 2000, custody order and the grandparents’ motion for increased grandparent visitation.
¶20 While Paslov’s motions were pending, Cox entered into negotiations with the Powell County Attorney’s office regarding an earlier charge of Parenting Interference, a felony, pursuant to § 45-5-634, MCA, for her removal of Dylan from Montana. These negotiations resulted in a March 22,2002, deferred prosecution agreement in which Cox agreed to not violate any Montana laws for a period of one year and to follow all valid court orders issued in this matter.
¶21 On August 20,2002, Cox filed a Writ of Supervisory Control with this Court, alleging the District Court erred in failing to recognize the jurisdiction of the High Court of American Samoa to issue a modified parenting plan which awarded custody to her. We denied the writ on grounds an appeal would provide an adequate remedy for the error alleged by Cox. On October 10,2002, Cox filed a notice of appeal of the District Court’s July 22,2002, enforcement order. Paslov filed a motion to dismiss the appeal as untimely. We denied Paslov’s motion, concluding Cox’s appeal, although filed beyond thirty days after the order, was nonetheless timely filed under Rule 5(c), M.R.App.P., because a notice of the entry of judgment had never been served.
STANDARD OF REVIEW
¶22 We review a district court’s findings of fact to determine whether the findings are clearly erroneous. In re Marriage of Shape (1996), 276 Mont. 409, 416, 916 P.2d 744, 748 (citation omitted). We review a district court’s conclusions of law to determine if the court’s interpretation of the law is correct. Shupe, 276 Mont. at 416, 916 P.2d at 748 (citation omitted).
DISCUSSION
¶23 The District Court correctly assumed jurisdiction of the Oregon Parenting Plan and modified it to award Paslov sole custody of Dylan. The Samoan Court subsequently asserted jurisdiction over the Montana modification and awarded Cox sole custody of Dylan. As maintained by Cox, the resolution of these conflicting custody *100 determinations must be decided under the federal Parental Kidnaping Prevention Act[1] (PKPA), 28 U.S.C. § 1738A, which sets forth jurisdictional guidelines in face of competing custody decisions by sister states. Cox asserts that under the PKPA: (1) Montana does not have exclusive jurisdiction over this custody dispute, and (2) American Samoa properly exercised jurisdiction in rendering its custody decision. Conversely, Paslov argues the District Court never lost jurisdiction over this matter.
¶24 While both parties have acted grievously in this matter with assertions of abuse, stalking and kidnaping, the case before us is simply one of a jurisdictional matter. The essential question in this case is which of two state courts had jurisdiction to make a custody determination involving Dylan: the District Court or the Samoan Court,[2] which have rendered opposing custody determinations.
¶25 The Uniform Child Custody Jurisdiction Act (UCCJA) has been adopted in all fifty states, the District of Columbia and the Virgin Islands. Stoneman v. Drollinger, 2003 MT 25, ¶ 12, 314 Mont. 139, ¶ 12, 64 P.3d 997, ¶ 12. The UCCJA was created “to remedy th[e] intolerable state of affairs where self-help and the rule of ‘seize and run’ prevail ....” Lansing & Sherman, The Legal Response to Child Snatching, 7 J.Juv.L. 16,19 (1983) (quoting UCCJA, Commissioners’ Prefatory Note, 9 Uniform Laws Annotated (ULA) 112 (1979)). In 1999, the Montana Legislature adopted the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), which repealed and replaced the UCCJA provisions in Montana law. Stoneman, ¶ 14.
¶26 However helpful the uniform enactments have been, they nonetheless operate in large part at the state level, while the parental conduct they are designed to prevent is essentially interstate in nature. Thus, in 1980, the federal government enacted the PKPA to establish national standards addressing the continuing problems of forum shopping and child snatching. Full faith and credit must ordinarily be given to a custody determination made by a court of another state if that court appropriately exercised jurisdiction under PKPA standards. See 28 U.S.C. § 1738A(a); Erler v. Erler (1993), 261 Mont. 65, 69, 862 P.2d 12, 15; Shape, 276 Mont. at 414, 916 P.2d at *101 747.
¶27 For convenience, we will refer to the state that originally entered the custody decree as the “District Court,” and the state that modified that decree as the “Samoan court.” The PKPA provides in pertinent part:
§ 1738A. Full faith and credit given to child custody determinations.
(a) The appropriate authorities of every State shall enforce according to its terms, and shall not modify except as provided in subsections (f), (g), and (h) of this section, any custody determination or visitation determination made consistently with the provisions of this section by a court of another State.
(c) A child custody or visitation determination made by a court of a State is consistent with the provisions of this section only if—
(1) such court has jurisdiction under the law of such State; and
(2) one of the following conditions is met:
(A) such State (i) is the home State of the child on the date of the commencement of the proceeding, or (ii) had been the child’s home State within six months before the date of the commencement of the proceeding and the child is absent from such State because of his removal or retention by a contestant or for other reasons, and a contestant continues to live in such State;
(B)(i) it appears that no other State would have jurisdiction under subparagraph (A), and (ii) it is in the best interest of the child that a court of such State assume jurisdiction because (I) the child and his parents, or the child and at least one contestant, have a significant connection with such State other than mere physical presence in such State, and (II) there is available in such State substantial evidence concerning the child’s present or future care, protection, training, and personal relationships;
(C) the child is physically present in such State and (i) the child has been abandoned, or (ii) it is necessary in an emergency to protect the child because the child, a sibling, or parent of the child has been subjected to or threatened with mistreatment or abuse;
(D)(i) it appears that no other State would have jurisdiction under subparagraph (A), (B), (C), or (E), or another State has *102 declined to exercise jurisdiction on the ground that the State whose jurisdiction is in issue is the more appropriate forum to determine the custody or visitation of the child, and (ii) it is in the best interest of the child that such court assume jurisdiction; or
(E) the court has continuing jurisdiction pursuant to subsection (d) of this section.
(d) The jurisdiction of a court of a State which has made a child custody or visitation determination consistently with the provisions of this section continues as long as the requirement of subsection (c)(1) of this section continues to be met and such State remains the residence of the child or of any contestant.
(f) A court of a State may modify a determination of the custody of the same child made by a comb of another State, if—
(1) it has jurisdiction to make such a child custody determination; and
(2) the court of the other State no longer has jurisdiction, or it has declined to exercise such jurisdiction to modify such determination.
(g) A court of a State shall not exercise jurisdiction in any proceeding for a custody or visitation determination commenced during the pendency of a proceeding in a court of another State where such court of that other State is exercising jurisdiction consistently with the provisions of this section to make a custody or visitation determination.
28 U.S.C. § 1738A(a), (c)(1), (c)(2), (d), (f), (g). These provisions of the PKPA provide that a second state may only modify the custody decree of the first state in very limited circumstances, even though both states may have an interest in the matter.
¶28 Subsection (f) is the key modification provision of the PKPA and creates a two-pronged test for courts to apply. Before a second state may modify the decree of the first state, (1) the second state must have jurisdiction under its own laws, 28 U.S.C. § 1738A(f)(l); and (2) the first state must have lost or given up its jurisdiction, both “continuing” and “pending.” 28 U.S.C. § 1738A(f)(2). If the first state has neither lost nor refused jurisdiction, there would be no need to ascertain whether the second state has authority to assume jurisdiction. Thus, we turn to the question of Montana’s jurisdiction.
Montana’s Jurisdiction over the Oregon Parenting Plan
¶29 The State of Montana may assume jurisdiction for purposes of *103 modifying a child custody determination when a conflict arises involving a disparate decree from sister states under the UCCJEA, codified at § 40-7-203, MCA, which provides:
Jurisdiction to modify determination. Except as otherwise provided in 40-7-204, a court of this state may not modify a child custody determination made by a court of another state unless a court of this state has jurisdiction to make an initial determination under 40-7-20l(l)(a) or (l)(b) and:
(1) the court of the other state determines it no longer has exclusive, continuing jurisdiction under 40-7-202 or that a court of this state would be a more convenient forum under 40-7-108; or
(2) a court of this state or a cotut of the other state determines that the child, the child’s parents, and tuny person acting as a parent do not presently reside in the other state.
Section 40-7-201(l)(a) and (l)(b), MCA, referenced in § 40-7-203, MCA, provides:
Initial child custody jurisdiction. (1) Except as otherwise provided in 40-7-204, a court of this state has jurisdiction to make an initial child custody determination only if:
(a) this state is the home state of the child on the date of the commencement of the proceeding or was the home state of the child within 6 months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state;
(b) a court of another state does not have jurisdiction under subsection (l)(a), or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under 40-7-108 or 40-7-109, and:
(i) the child and the child’s parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence; and
(ii) substantial evidence is available in this state concerning the child’s care, protection, training, and personal relationships
In sum, under the UCCJEA, in order to modify a determination made by a court of another state, a Montana court must have jurisdiction under § 40-7-20l(l)(a), MCA, or § 40-7-20l(l)(b)(i) and (ii), MCA; and § 40-7-203(1), MCA, or § 40-7-203(2), MCA.
¶30 In its order accepting jurisdiction over the Oregon parenting plan, the District Court found that both Cox and Dylan were residing in Deer Lodge and that Dylan had significant contacts in Montana. *104 Additionally, a review of the record reveals that Cox and Dylan moved to Montana in the fall of 1999, most likely in October, which would have established the requisite six-month “home state” criteria of § 40-7-201(l)(a), MCA,[3] prior to Paslov’s filing of his April 2000 motion to amend the Oregon parenting plan. Neither party asserts that the six-month period was not satisfied. The District Court’s finding of “significant contacts” constitutes fulfillment of only part of the requisite criteria of § 40-7-201(1)(b), MCA, specifically, subpart (i). However, fulfillment of § 40-7-201(1)(b), MCA, is not necessary in light of fulfillment of the criteria of § 40-7-201(1)(a), MCA, as long as § 40-7-203(1) or § 40-7-203(2), MCA, is met. The court’s finding that Dylan and Cox were residing in Montana meets the requirement of § 40-7-203(2), MCA (“the child, [and] the child’s parents ... do not presently reside in the other state”). Thus, Montana met the requisite jurisdictional requirements under § 40-7-201(1)(a) and § 40-7-203(2), MCA. Additionally, the record reflects that Cox specifically stipulated to Montana jurisdiction. Therefore, we accept as appropriate Montana’s initial decision and exercise of jurisdiction over the Oregon parenting plan leading to its order of September 11, 2000.
¶31 The question then'becomes whether the District Court retained that jurisdiction under subsection (d) of the PKPA.
Montana’s Jurisdiction under the PKPA
¶32 The PKPA enables a sister state to modify a child custody determination of the first state when (1) it has jurisdiction to make such a child custody determination under its own laws; and (2) the court of the first state no longer has jurisdiction, either by losing jurisdiction or declining to exercise such jurisdiction to modify such determination. 28 U.S.C. § 1738A(f); Erler, 261 Mont. at 70, 862 P.2d at 15-16. Therefore, before a second state may modify a decree of the first state, the first state must have lost or given up its “continuing” or “pending” jurisdiction. If Montana has not lost jurisdiction, the Samoan Court has no authority to assume jurisdiction, and instead, it must enforce the Montana custody determination. 28 U.S.C. § 1738A(a).
¶33 A state retains “continuing” jurisdiction as long as it satisfies two requirements: (1) it has jurisdiction under its own law, and (2) it *105 remains the residence of the child or any of the contestants. 28 U.S.C. § 1738A(d). If a state has “continuing” jurisdiction, other states must enforce, and may not modify, the custody determination by the first state. Here, at the time the District Court made its September 11, 2000, custody determination awarding sole custody to Paslov, the District Court had jurisdiction under § 40-7-203, MCA, satisfying the first requirement of § 1738A(d): jurisdiction under its own law. Nevertheless, the second requirement of subsection (d)-the state remains the residence of the child or any of the contestants-was no longer satisfied as of July 8, 2000, when Cox and Dylan relocated to American Samoa. Although Cox and Dylan were no longer in Montana because Cox removed Dylan across state lines while custody proceedings were pending in Montana, an act which the PKPA was designed to prevent, the fact remains that neither of the parties nor the child resided in Montana. Thus, Montana did not retain “continuing” jurisdiction as that term is defined for the specific purposes of the PKPA.
¶34 However, the PKPA also provides that, in addition to “continuing” jurisdiction, the first state may also retain “pending” jurisdiction. Subsection (g) of the PKPA directs a court to abstain from exercising jurisdiction in “any proceeding for a custody or visitation determination commenced during the pendency of a proceeding in a court of another State where such court of that other State is exercising jurisdiction consistently with the provisions of [the Act] to make a custody or visitation determination.” 28 U.S.C. § 1738A(g). Thus, the question is whether, following the District Court’s custody order of September 11, 2000, it retained “pending jurisdiction” of the matter at the time Cox Initiated the action in American Somoa on November 22, 2000.
¶35 Judge Mizner’s order of September 11,2000, clearly provides that he was anticipating psychological reports from licensed therapists for further custody and visitation determinations. Additionally, the court ordered that the search for Cox’s whereabouts continue and be reported back to it. Further, Cox, in her deferred prosecution for Parental Interference, agreed to follow all valid court orders issued in this matter. All of these demonstrate the District Court still had “pending” proceedings that ultimately were going to impact the custody and visitation of Dylan.
¶36 While it is not necessary for further analysis, we will briefly review Cox’s argument that American Samoa could exercise emergency jurisdiction pursuant to the PKPA. The PKPA provides for emergency *106 jurisdiction when the child is physically present in the state and it is necessary in an emergency to protect the child because the child has been “subjected to or threatened with mistreatment or abuse.” 28 U.S.C. § 1738A(c)(2)(C)(ii). Cox asserts her decision to return to American Samoa was based on fear because Paslov had threatened her life and the lives of her children, and that Paslov had a propensity for violence. Paslov, conversely, characterizes Cox’s actions as a “secret flight to Samoa” for the purpose of unilaterally “snatching” the child in hopes of finding another forum in which she could obtain a more favorable outcome. Even if Cox’s allegations of Paslov’s drug abuse, violent propensities and fear for her and her children’s lives are true, at best, the Samoan court should only have exercised temporary emergency jurisdiction under the PKPA whereby it protected Dylan from substantial and imminent harm and continued emergency jurisdiction only until the proper forum was determined; and in this case, that forum is the Montana court system. In fact, the District Court found that Cox “had several legal remedies available to her to protect herself and her child from [Paslov] in this jurisdiction if in fact she felt threatened by him.” Instead, Cox left the jurisdiction without notice to either Paslov or the District Court.
¶37 It must be remembered that the purpose of the UCCJEA, and the PKPA, is to prevent precisely what occurred here, the removal of a child from one jurisdiction to another, in order to obtain a different result regarding custody or other matters affecting the minor child. While bad acts occurred on both sides of this case, it remains that under the law, Cox cannot divest Montana of jurisdiction simply by removing Dylan to American Samoa, which does not recognize the UCCJEA, thereby to restart the entire issue. We are satisfied the District Court was fully aware of and properly applied the correct law in addressing this jurisdictional issue. We conclude the District Court did not decline jurisdiction to American Samoa, and instead retained jurisdiction under the “pending” jurisdiction provision of the PKPA.
¶38 The District Court’s order is affirmed.
CHIEF JUSTICE GRAY, JUSTICES WARNER, COTTER and LEAPHART concur.

 See Erler v. Erler (1993), 261 Mont. 65, 69, 862 P.2d 12, 15, where the complete text of the Parental Kidnaping Prevention Act, 28 U.S.C. § 1738A, is set forth in footnote 1 of that opinion.

 The PKPA applies to American Samoa since the PKPA defines “state” as including “a territory or possession of the United States.” 28 U.S.C. § 1738A(b)(8).

 “Home state” means the state in which a child lived with a parent or a person acting as parent for at least 6 consecutive months immediately before the commencement of a child custody proceeding. Section 40-7-103(7), MCA.